**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br>    Plaintiff<br>    v.<br>NATIONAL MEDIATION BOARD, *et al.*,<br>    Defendants | Civil Action No. 15-1010 (CKK) |

**MEMORANDUM OPINION**
(June 21, 2016)

This case concerns an election—a union representation election among employees of Intervenor Allegiant Air, LLC. Before the Court are Plaintiff International Brotherhood of Teamsters' [16] Motion for Summary Judgment; Defendant National Mediation Board's [17] Cross-Motion for Summary Judgment; and Intervenor Allegiant Air, LLC's [19] Cross-Motion for Summary Judgment. Plaintiff International Brotherhood of Teamsters ("the Teamsters") challenges the decision of Defendant National Mediation Board ("the Board") not to hold a run-off election where the initial ballot resulted in a tie between the incumbent union and the option to choose "no representation." Plaintiff argues that the Board is mandated by the language of the Railway Labor Act to hold a run-off election in these circumstances; Defendant and Intervenor both disagree. The Court concludes that the relevant statutory provision of the Railway Labor Act is ambiguous, that the Board's interpretation of that provision is reasonable, and that, therefore, the Board's decision not to conduct a run-off election survives the limited scope of this Court's review under the Railway Labor Act. As explained further below, upon consideration of the pleadings,[1] the relevant legal authorities, and the record for purposes of this motion, the

---

[1] The Court's consideration has focused on the following documents:

1

Court GRANTS Defendant National Mediation Board's [17] Cross-Motion for Summary Judgment and Intervenor Allegiant Air, LLC's [19] Cross-Motion for Summary Judgment and DENIES Plaintiff's [16] Motion for Summary Judgment.

## I. BACKGROUND

**A. Statutory Framework**

"Labor relations in the railroad and airline industries are governed by the Railway Labor Act." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 478 (D.C. Cir. 2011) (citing 45 U.S.C. §§ 151 *et seq.*). "Passed in 1926 and amended several times since, the Act seeks to avoid strikes by encouraging bargaining, arbitration, and mediation." *Id.* The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has recognized that "[t]he Railway Labor Act has little to say about how employees are to choose their representatives." *Id.* However, the Act does specify that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class." 45 U.S.C. § 152, Fourth. Moreover, the Act "established the National Mediation Board, assigning it the task of recognizing and certifying the chosen representative." *Air Transp. Ass'n*,

---

- Pl.'s Mot. for Summary Judgment ("Pl.'s Mot."), ECF No. 16;
- Def.'s Cross-Mot. for Summary Judgment ("Def.'s Mot."), ECF No. 17;
- Intervenor's Cross-Mot. for Summary Judgment ("Int.'s Mot."), ECF No. 19;
- Reply in Supp. of Pl.'s Mot. for Summary Judgment ("Pl.'s Reply"), ECF No. 22;
- Intervenor's Reply in Supp. of its Mot. for Summary Judgment ("Int.'s Reply"), ECF No. 23; and
- Reply in Further Supp. of Def.'s Cross-Mot. for Summary Judgment ("Def.'s Reply"), ECF No. 24.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

663 F.3d at 478 (citing 45 U.S.C. §§ 152, Ninth, 154). The statute establishes the responsibilities of the National Mediation Board as follows:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, *to investigate* such dispute and *to certify* to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.

45 U.S.C. § 152, Ninth (emphasis added). After such certification, the employer carrier is required to "treat with"—that is, negotiate with—the certified representative. *Id.*

The statute further establishes several parameters for the Board's role in investigating and certifying an employee representative. First, the National Mediation Board is "authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." *Id.* Second, if the Board conducts an election, the Board is authorized to determine "who may participate in the election and establish the rules to govern the election." *Id.*

Finally, in a provision added by Congress in 2012, which underlies the dispute in this case, the statutes provides the following directions regarding runoff elections:

> In any such election for which there are 3 or more options (including the option of not being represented by any labor organization) on the ballot and no such option receives a majority of the valid votes cast, the Mediation Board shall arrange for a second election between the options receiving the largest and the second largest number of votes.

45 U.S.C. § 152, Ninth; *see* FAA Modernization and Reform Act of 2012, P.L. 112-95, 126 Stat. 11, 146 (Feb. 14, 2012). Prior to this amendment, the Railway Labor Act did not include a

specific provision governing run-off elections. *See id.* However, pursuant to Board regulations promulgated in 1947, it has long been the Board's practice to conduct run-off elections in certain circumstances. *See* 12 Fed. Reg. 3,083 (May 10, 1947) (promulgating provision); 13 Fed. Reg. 8,740 (Dec. 30, 1948) (redesignating provisions).

After the 2012 revisions to the Railway Labor Act, the National Mediation Board promulgated revised its regulations regarding election procedures. The regulations promulgated described when run-off elections must be held:

> In an election among any craft or class where three or more options (including the option for no representation) receive valid votes, if no option receives a majority of the legal votes cast, or in the event of a tie vote, the Board shall authorize a run-off election.

Representation Procedures and Rulemaking Authority, 77 Fed. Reg. 75,543, 75,449 (Dec. 21, 2012) (codified at 29 C.F.R. § 1206.1).[2] The Board also promulgated changes to the provision governing the form of the ballots to be used in a run-off election, as follows:

> In the event a run-off election is authorized by the Board, the names of the two options which received the highest number of votes cast in the first election shall be placed on the run-off ballot, and no blank line on which voters may write in the name of any organization or individual will be provided on the run-off ballot.

*Id.* (codified at 29 C.F.R § 1206.1(b)).[3]

---

[2] Previously, the analogous provision of the regulations provided as follows:

> If in an election among any craft or class no organization or individual receives a majority of the legal votes cast, or in the event of a tie vote, a second or run-off election shall be held forthwith: *Provided*, That a written request by an individual or organization entitled to appear on the run-off ballot is submitted to the Board within ten (10) days after the date of the report of results of the first election.

29 C.F.R. § 1206.1(a) (2011). This language was originally promulgated in 1947. *See* 12 Fed. Reg. at 3,083.

[3] Previously, the analogous provision of the regulations provided as follows:

> In the event a run-off election is authorized by the Board, the names of the two individuals or organizations which received the highest number of votes cast in

Some context to the 2012 amendments helps to illuminate the issues before the Court. Until 2010, the Board determined the outcome of representation election on the basis of all *eligible* votes, rather than on the basis of votes *cast*. *See Air Transp. Ass'n of Am.*, 663 F.3d at 477. As explained by the D.C. Circuit, "[f]or seventy-five years, the National Mediation Board counted non-voters as voting against union representation, thereby requiring a majority of eligible voters to affirmatively vote for representation before a union could be certified." *Id.* Under that scheme, the only way to intentionally "vote" against representation was to refrain from voting. *See id.* at 478 ("For example, a ballot might present the option of voting for union A, union B, or union C, and those preferring no union representation would simply abstain. Whichever candidate received a majority of the votes would become the elected representative unless, of course, a majority of voters abstained.").

In 2010, the Board promulgated a rule under which "election [would] be decided by a majority of votes *cast*, and those not voting will be understood as acquiescing to the outcome of the election."[4] *Id*. (emphasis added). Under the revised election procedures, "ballots [would] include a 'no union' option so that employees can affirmatively vote against union representation." *Id.* That is, all first-round election ballots would include the following options: (1) one or more named representatives, (2) a "no representation" option, and (3) the opportunity to write-in a representative of the voter's choice. *Id.* at 485. When a union seeks to replace an incumbent union representative, the ballot will include both the incumbent representative and the

---

       the first election shall be placed on the run-off ballot, and no blank line on which
       votes may write in the name of any organization or individual will be provided on
       the run-off ballot.

29 C.F.R. § 1206.1(b) (2011). This language was originally promulgated in 1947. *See* 12 Fed. Reg. at 3,083.

[4] The D.C. Circuit upheld this regulatory scheme in 2011. *Air Transp. Ass'n*, 663 F.3d 488-89.

proposed alterative representative. *See id.* If any employees seek to decertify the incumbent union, seeking to remain unrepresented, "employees designate a straw man to run against the union representative with the understanding that, if elected, the straw man would disclaim any representative status." *Id.* at 484. A ballot in a decertification election would include the "straw man," in addition to the incumbent representative, the "no representation" option, and the opportunity to write-in other candidates. *Id.* at 485.

The Board has a longstanding process of organizing run-off elections when no representative garners a majority on the initial ballot.[5] *See id.* at 485-65; Representation Procedures and Rulemaking Authority, 77 Fed. Reg. 28,536, 28,536 (proposed May 15, 2012) (to be codified at 29 C.F.R. § 1206.1). Until the 2012 amendments to the Railway Labor Act—both before and after the 2010 regulatory changes—the Board had the practice of aggregating votes for any union representative in determining whether to hold a runoff election and which options would be listed on the runoff ballot. *See* 77 Fed. Reg. at 28,536. The Board explained the aggregation process in place as of 2012 as follows:

> Prior to the enactment of the FAA Reauthorization, under its previous practice in representation elections, the Board aggregated all votes cast for representation, including write-in votes. Where a majority of employees have cast valid ballots for representation but no individual or organization received a majority of the ballots cast, the issue to be determined was which of the individuals or organizations would be the representative. Thus, the run-off election, once authorized, would be between the two individuals or organizations that received the highest number of votes.

77 Fed. Reg. at 28,536 (citing 29 C.F.R. § 1206.1). In other words, the Board would add up all of the votes for *any* union representative on the first ballot. *Air Transp. Ass'n*, 663 F.3d at 485. If that *total* constituted a majority, but no *single representative* received a majority, the Board

---

[5] Until 2010 the threshold for a majority was calculated based on all eligible voters; after 2010, it was calculated based on the number of votes cast. *See* 77 Fed. Reg. at 28,536

6

would hold a run-off election. *Id.* The two options in that run-off election would be the top two vote recipients among the union representatives. *Id.*

As noted above, in 2012, Congress amended the Railway Labor Act to add an explicit provision regarding run-off elections, whereas no such statutory provision existed previously. As amended, the statute includes the following language:

> In any such election for which there are 3 or more options (including the option of not being represented by any labor organization) on the ballot and no such option receives a majority of the valid votes cast, the Mediation Board shall arrange for a second election between the options receiving the largest and the second largest number of votes.

45 U.S.C. § 152. As the Board explained in a rulemaking following those amendments, "[t]he amendments to the RLA now require that the Board no longer aggregate votes for representation and that any run-off election will be between the two *ballot options* that receive the most votes." 77 Fed. Reg. at 28,536 (emphasis added). The Board emphasized, as does the statutory language, that the "two ballot options" "can include the 'no' option."[6] *Id.*

The agency proposed certain regulatory changes in light of the statutory amendment. *See id.* at 28,536, 28,537; Representation Procedures and Rulemaking Authority; Correction, 77 Fed. Reg. 33,701, 33,701 (rule proposed June 7, 2012) ("The proposed rule changes the National Mediation Board's … existing rules for run-off elections to incorporate language added to the Railway Labor Act … by the Federal Aviation Administration Modernization and Reform Act of 2012."). Accordingly, the agency promulgated the following regulation that is at the core of this case:

---

[6] The amendment also transformed the run-off into a statutory requirement, triggered by the circumstances explained here, rather than by the request of a participant. *Id.* ("The Board's Rules also required that a participant initiate a run-off election with a written request. The amended language now requires the Board to 'arrange for' a second election when no ballot option receives a majority of the ballots cast.").

7

> In an election among any craft or class where three or more options (including the option for no representation) receive valid votes, if no option receives a majority of the legal votes cast, or in the event of a tie vote, the Board shall authorize a run-off election.

77 Fed. Reg. at 75,449. As the agency noted, the rule ultimately adopted "clarif[ies] that Rule 1206.1 only applies in elections where 3 or more options receive valid votes." 77 Fed. Reg. at 33,701.[7]

## B. Factual Background

Before February 2015, the "Flight Dispatchers" employed by Allegiant Air were represented by the Airline Division of the Teamsters. *In the Matter of the Representation of Employees of Allegiant Air, LLC, Flight Dispatchers*, 42 NMB 124, 124 (May 6, 2015). On February 26, 2015, Ronald D. Doig invoked the services of the Board "to investigate and determine who may represent" the class of "Flight Dispatchers" under the Railway Labor Act. *Id.* Doig offered himself as a representative. *Id.* It is apparent from the record that Doig, who ultimately received no votes, offered himself as a "straw man," following the Board's procedures for an individual seeking to decertify an incumbent union. *See id.* at 123-25. The election ballot consisted of the following language:

---

[7] After receiving no substantive comments to the provisions at issue in this case, the Board promulgated the regulation as proposed in the corrected proposed rule. *See* 77 Fed. Reg. 75,543 n.1; *compare id.* at 75,549 (language of the final rule) *with* 77 Fed. Reg. at 33,701 (language of corrected proposed rule).

Make your selection for Representation or No Representation from the following choices:

- ☐ YES. I vote for International Brotherhood of Teamsters, Airline Division.
- ☐ YES. I vote for Ronald D. Doig.
- ☐ YES. I vote for Any Other Organization or Individual.
  _____
- ☐ NO. I vote for no representative.

AR 000056. The election results were reported by the Board as follows:

| Election Results for Flight Dispatchers | |
|---|---|
| Eligible Employees | 17 |
| Total Valid Votes | 14 |
| IBT [International Brotherhood of Teamsters] | 7 |
| Ronald D. Doig | 0 |
| "No" Votes | 7 |
| Void Votes | 0 |

42 NMB at 125. At the request of the Teamsters, the Board allowed the submission of briefs regarding the legal implications of the tie vote in the election. *See* AR 00060-61. Upon consideration of the briefs submitted, the Board concluded that, under the Board's regulations, the results did not trigger a run-off election. 42 NMB at 126. Specifically, the Board concluded that because there were not "three or more options (including the option for no representation) [that] receive[d] valid votes," a run-off was not required. *See id.* (quoting 29 C.F.R § 1206.1). Therefore, no run-off was held. *Id.* The Teamsters then brought this action challenging the Board's decision and the underlying legal interpretation.

9

## II. LEGAL STANDARD

"Judicial review of [National Mediation Board] decisions is extraordinarily limited." *Prof'l Cabin Crew Ass'n v. Nat'l Mediation Bd.*, 872 F.2d 456, 459 (D.C. Cir. 1989) (citing *Switchmen's Union of N. Am. v. NMB,* 320 U.S. 297 (1943); *Brotherhood of Railway & S.S. Clerks v. Association for the Benefit of Non–Contract Employees,* 380 U.S. 650 (1965)). "Normally, district courts lack jurisdiction to review certification decisions rendered by the NMB within its scope of authority under § 2, Ninth of the [Railway Labor Act]."[8] *US Airways, Inc. v. Nat'l Mediation Bd.*, 177 F.3d 985, 989 (D.C. Cir. 1999) (citing *Railway Labor Executives' Ass'n v. NMB* ("*RLEA"),* 29 F.3d 655, 662 (D.C. Cir.) (en banc); *id*. at 673 (Randolph, J., concurring, joined by Mikva, C.J., Wald, J., Edwards, J., and Sentelle, J., together comprising a majority of the court), *amended* 38 F.3d 1224 (D.C. Cir. 1994) (en banc)). "But this presumption of nonreviewability falls away if the complainant makes a 'showing on the face of the pleadings that the certification was a gross violation of the [Railway Labor Act] or that it violated the constitutional rights of an employer, employee, or Union.' "[9] *Id.* (citing *Prof'l Cabin Crew Ass'n*, 872 F.3d at 459). "In examining a challenge predicated on the exception for a gross violation of the [Railway Labor Act], we take only a 'peek at the merits'; that is, we limit the inquiry to 'specific statutory language, without extension to arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.' " *Id.* (quoting *International Brotherhood of Teamsters v. Brotherhood of Ry. Clerks,* 402 F.2d 196, 205 (D.C. Cir. 1968)).

---

[8] This narrow standard is inapplicable if a party directly challenges a rulemaking pursuant to the normal channels of the Administrative Procedure Act. *US Airways*, 177 F.3d at 989 n.2; *see also Air Transp. Ass'n*, 663 F.3d at 483-86 (analyzing challenge to rulemaking under the Administrative Procedure Act without referencing narrow standard of review of certification decisions under the Railway Labor Act).

[9] There are no claims of constitutional violations in this case.

### III. DISCUSSION

The sole question in this case is whether the Board's refusal to hold a run-off election in the aftermath of the tie vote between the Teamsters and the "no representation" option is a gross violation of the Railway Labor Act.[10] Plaintiff contends that the failure to hold a run-off was a gross violation; the Board and Intervenor Allegiant Air disagree, arguing that there was no violation whatsoever, let alone a gross violation. Upon consideration of the parties' arguments, the Court concludes that the Board did not violate the provisions of the Railway Labor Act.

As noted above, in a challenge to a certification decision of the Board predicated on a claim of a "gross violation," as in this case, this Court may only "peek at the merits." Therefore, to evaluate Plaintiff's claim that the Board failed to abide by explicit statutory language in the Railway Labor Act, the Court applies the framework established in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). The Court first asks "whether Congress has directly spoken to the precise question at issue, in which case we must give effect to the unambiguously expressed intent of Congress." *Deppenbrook v. Pension Benefit Guar. Corp*, 778 F.3d 166, 172 (D.C. Cir.

---

[10] In *Railway Labor Executives Association*, the en banc D.C. Circuit referenced a second basis for judicial review over certain actions of the National Mediation Board: when an "action of the Board [does not fall] within the compass of authority delimited by Section 2, Ninth," such as where "the Board ha[d] no threshold to act at all." 29 F.3d at 662. The relationship between this ground for jurisdiction and the jurisdiction over alleged "gross violations" is less than wholly clear. In any event, the Court concludes that this alternative framework provides no basis for judicial review in this case. In its reply brief, Plaintiff presents for the first time such an argument, arguing that the regulation underlying the Board's actions "exceeded the compass of its limited authority." Pl.'s Reply at 4. Because Plaintiff waited until its reply brief to present this argument, the Court concludes that this argument is forfeited. In any event, the Court disagrees that the alleged violations "exceed the compass of the authority delimited by Section 2, Ninth." *Id.* Unlike in *Railway Labor Executives Association*, it is clear that the Board here was acting under the scope of its authority under the statute. *Cf. id.* (no authority to become involved in representation dispute absent an employee request). The only question is whether the Board's *exercise* of that authority comported with the statute. The Court analyzes that question in the remainder of this Memorandum Opinion.

2015) (citation omitted). "If the statute is silent or ambiguous with respect to the specific issue, however, we move to the second step and defer to the agency's interpretation as long as it is based on a permissible construction of the statute." *Id.* "To trigger deference," an agency must show that Congress has " 'delegated authority to the agency generally to make rules carrying the force of law' " and that " 'the agency interpretation claiming deference was promulgated in the exercise of that authority.' " *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1136 (D.C. Cir. 2014) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)).

The question before the Court is narrow: whether the regulatory scheme pursuant to which the Board declined to conduct a run-off election is lawful under the Railway Labor Act, not whether Congress has chosen the *best* statutory scheme or whether the agency has implemented that scheme through the *best* set of regulations. *See Ark Initiative v. Tidwell*, 816 F.3d 119, 126-27 (D.C. Cir. 2016) ("The question before us is of a type ubiquitous to administrative law: Whether the Colorado rule is permissible under federal law, not whether we believe as a matter of environmental policy it is the best rule, or even a good one."). With that in mind, the Court proceeds to *Chevron*'s two steps.[11]

---

[11] The Court reiterates that this inquiry is particularly narrow in this Railway Labor Act case. *See RLEA*, 29 F.3d at 662 (("[W]e limit the inquiry to 'specific statutory language, without extension to arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.' ") (quoting *Brotherhood of Ry. Clerks,* 402 F.2d at 205). However, the Court need not closely examine any differences between the standard *Chevron* inquiry and the inquiry under the "peek" allowed under the Railway Labor Act because the Court concludes that the Board's action survives both of *Chevron*'s steps with flying colors.

**A.  *Chevron* Step One**

"Under step one, the court must determine 'whether Congress has directly spoken to the precise question at issue.'" *W. Minnesota Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588, 591 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 842). "If so, then the court and the agency must 'give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron*, 467 U.S. at 842–43). "In addressing a question of statutory interpretation, the court begins with the text." *Id*. As presented above, the following provision of the statute governs run-off elections in the context of representation disputes:

> In any such election for which there are 3 or more options (including the option of not being represented by any labor organization) on the ballot and no such option receives a majority of the valid votes cast, the Mediation Board shall arrange for a second election between the options receiving the largest and the second largest number of votes.

45 U.S.C. § 152, Ninth.

Plaintiff argues that the plain language of the statute requires that the Board hold a run-off election in these circumstances—where there was a tie vote between the Teamsters option on the ballot and the "no representation option" and where no other votes were cast for any alternatives. By contrast, the Board and Intervenor Allegiant argue that Congress has not spoken to the question of whether the Board must conduct a run-off in these circumstances and that, therefore, this question must be resolved under *Chevron* Step Two.

The Court agrees with the Board and with Allegiant Air that the statute does not address the situation in this case: where there were *three* or more options on the ballot, but where only *two* options received any votes. Neither the language of the statute nor its context provides an unambiguous answer to this question.

As noted by the Board and by Allegiant Air, the statute specifies that a run-off election be conducted between the "options receiving the largest and the second largest number of votes." 45

U.S.C. § 152, Ninth. This phrase suggests that run-off elections are only to be conducted when *more than two* options receive votes. With respect to circumstances where only two options receive votes, it would be unusual to refer to the option that receives the lowest number of votes as the "second largest number of votes." While this language may not indicate clearly that the statute does not envision a run-off election at a minimum, this language indicates that the statutory provision is *ambiguous* as to whether a run-off election is necessary in these circumstances.

      Moreover, it is apparent that a run-off election where only two options received votes would be futile. Indeed, it would appear likely the outcome of a run-off election where no vote-receiving options were eliminated would be identical to the initial election. Therefore, a run-off election would simply be futile. Yet, Congress cannot be presumed to legislate a result that would be futile. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) ("This reading plainly violates the familiar doctrine that the Congress cannot be presumed to do a futile thing."). Plaintiff speculates that voters could switch their votes in a run-off election, or that prior non-voters could be persuaded to cast a vote. But such speculation is not a basis for creating precision in an otherwise ambiguous statutory provision. Finally, a run-off election between the same two parties that received votes in the initial election would not fulfill the purpose of a run-off, to narrow the field of candidates in order to ensure that the ultimate option selected has a majority of all votes cast. *See, e.g., Edelstein v. City & Cty. of San Francisco*, 56 P.3d 1029, 1041 (Cal. 2002) (citing *Burdick v. Takushi*, 504 U.S. 428, 438 (1992)). For that reason as well, the Court cannot conclude that the statute unambiguously requires a run-off in these circumstances.

      In sum, having fully considered the parties' arguments regarding the statute, the Court concludes that, as the Board and Allegiant Air argue, Congress has not spoken to the question at

issue.[12] Therefore, the Court proceeds to analyze the statutory provisions under *Chevron* Step Two.

**B. *Chevron* Step Two**

Under *Chevron* Step Two, the question for the Court is "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In 2012, the Board promulgated the following regulation concerning run-off elections:

> In an election among any craft or class where three or more options (including the option for no representation) *receive valid votes*, if no option receives a majority of the legal votes cast, or in the event of a tie vote, the Board shall authorize a run-off election.

77 Fed. Reg. at 75,449 (emphasis). In other words, pursuant to the Board's regulation, a run-off election is only held if more than two ballot options received "valid votes." Therefore, under this regulation, a run-off is not held if there are more than two candidates but only two receive votes, as in this case.

"*Chevron* deference is appropriate 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.' " *Mayo Found. for Med. Educ. & Research v. United States,* 562 U.S. 44, 57 (2011) (quoting *Mead Corp.,* 533 U.S. at 226–27). There is no dispute that the regulation was duly promulgated with notice and comment procedures and that it is eligible for deference. The only question is whether the interpretation promulgated by the Board itself is "permissible" or "reasonable." The Court agrees with the Board and with Intervenor Allegiant Air that the Board's interpretation is reasonable.

---

[12] Because the Court concludes that the language of the statute itself is ambiguous, there is no need to consult the statute's legislative history to make this determination.

"An interpretation is permissible if it is a 'reasonable explanation of how an agency's interpretation serves the statute's objectives.' " *Council for Urological Interests v. Burwell*, 790 F.3d 212, 219 (D.C. Cir. 2015) (citing *Northpoint Tech., Ltd. v. FCC,* 412 F.3d 145, 151 (D.C. Cir. 2005)). As noted above, prior to the promulgation of this regulation, Congress amended the Railway Labor Act to force the Board to include the "no representation" option as one of the top two options that are placed on a run-off ballot, forcing the Board to abandon its prior longstanding practice of aggregating votes in support of any union and of excluding the "no representation" option from run-off ballots. *See* 77 Fed. Reg. at 28,536. There is nothing in the record to suggest that Congress intended to require gratuitous run-off elections when only two options receive valid votes. Indeed, it is wholly sensible for the Board to interpret the statute's language only to require a run-off election when there are *more than* two options that actually received valid votes. In the absence of such valid votes, there is no reason to hold an additional election. Ultimately, the Court need not and cannot decide whether this interpretation is the best interpretation of the statutory language. The Court is only in the position to determine whether the Board's interpretation is a reasonable one, and for all of the reasons explained above, the Court does so today.

The Board's interpretation stated in its regulation survives *Chevron*'s two-step test, and the Board faithfully applied that regulation in choosing not to hold a run-off election in this case where only two options received votes and those options were tied. In sum, the Court's "peek" at the merits reveals that the Board did not violate the Railway Labor Act, let alone commit a gross violation that requires reversal of the Board's certification decision. Because none of Plaintiff's arguments require a different conclusion, in light of the narrow standard of review in this case

and the Court's required deference to the Board, the Court grants summary judgment to Defendant and to the Intervenor, and against Plaintiff.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant National Mediation Board's [17] Cross-Motion for Summary Judgment and Intervenor Allegiant Air, LLC's [19] Cross-Motion for Summary Judgment and DENIES Plaintiff's [16] Motion for Summary Judgment. The Court GRANTS summary judgment to Defendant and to Intervenor in full, and this case is dismissed in its entirety.

An appropriate Order accompanies this Memorandum Opinion.

Dated: June 21, 2016

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge